IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| INTIME STAFFING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:23-cv-151-JTA |
| | ) | (WO) |
| MEDICAL INDUSTRIES OF THE | ) | |
| AMERICAS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff InTime Staffing, LLC ("InTime") brings this action for breach of contract, account stated, unjust enrichment, open account, and services sold and delivered against Defendant Medical Industries of the Americas, Inc. ("MIA"). Defendant asserts the affirmative defenses of fraud in the inducement and statute of frauds.

This case was tried without a jury on October 21, 2024. Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact and conclusions of law.

### I.    JURISDICTION AND VENUE

Jurisdiction is proper pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue, and the Court finds allegations sufficient to support both. Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a magistrate judge, including trial and entry of final judgment. (Docs. No. 13, 14.)

## II.     STANDARD OF REVIEW

In civil trials, the plaintiff must prove every element of its claims by a preponderance of the evidence. *Fire Ins. Exch. v. McCoy*, 637 F. Supp. 2d 991, 992 (M.D. Ala. 2009). This burden is the same "regardless of whether the finder of fact is a judge in a bench trial or a jury." *Id*. (citing *Prickett v. United States*, 111 F. Supp. 2d 1191, 1192 (M.D. Ala. 2000)). A preponderance of the evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." (*Id*. (citing *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)). In a bench trial, the judge's "function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." *Prickett*, 111 F. Supp. 2d at 1192 (citing *Childrey v. Bennet*, 997 F.2d 830, 834 (11th Cir. 1993) ("it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony.")).

## III.     FINDINGS OF FACT

During the trial, the Court heard testimony from two witnesses. Plaintiff InTime presented the testimony of Frank Petrusnek, the manager of InTime. Defendant MIA presented the testimony of Abraham Summers, MIA's corporate agent, current chairman of the board, and former president. Based on the testimony and evidence presented at the bench trial, the Court finds the following facts.

InTime is a staffing company that provides temporary employees to other companies. InTime recruits employees, pays the employees, and provides various HR services for those employees. MIA is a manufacturing company that began producing latex

gloves in August 2022 in Eufala, Alabama. There are two large sums of money at issue in this case: (1) money owed pursuant to a written contract between the parties, and (2) money InTime loaned to MIA without a written contract.

## A. The Written Contract for Staffing Services

In May 2022, MIA approached InTime concerning staffing services for its manufacturing plant in Eufala. MIA represented to InTime that it had latex glove orders, including over $8 million in purchase orders from Notre Dame Medical and Yale Medical. InTime understood MIA submitted these purchase orders to a factoring company, which would provide an 80-90% advance on the $8 million in purchase orders. In addition, MIA represented to InTime it would make an initial public offering ("IPO") on the NASDAQ that would help raise over $10 million from various investors. MIA's initial goal was to file Form S-1, which is a Securities and Exchange Commission form for companies that wish to go public, in August 2022, and to have the IPO in December 2022.

On May 26, 2022, InTime signed a contract with MIA to provide staffing services for MIA's manufacturing plant.[1] (Joint Ex. 1.) Under the agreement, InTime paid not only the temporary employees they hired for MIA, but also MIA's administrative employees, such as the CFO, CEO, president, the plant manager, and legal counsel. The contract stated MIA would "use its best effort" pay all invoices upon receipt, but "payment shall not exceed **31 days** from receipt." (Joint Ex. 1 at 2 (emphasis in original).) Outstanding invoices accrue interest at an annual rate of 18%. From June 22, 2022, to January 26, 2023,

---

[1] The parties stipulated the contract is a valid and binding contract. (Trial Transcript, 4:2–3.)

InTime sent MIA 36 invoices. MIA did not pay any of the 36 invoices. In total, InTime provided $1,834,266.55 in staffing services to MIA that has not been paid. At the 18% interest rate, this balance is accruing approximately $900 in interest per day.

## B.  Loans

InTime provided two loans to MIA totaling $129,513.25. On August 25, 2022, InTime loaned MIA $100,000. On December 29, 2022, InTime loaned MIA $29,513.25. InTime loaned this money to MIA without a written contract. Nonetheless, MIA stipulated these loans were provided for the benefit of MIA with an expectation of repayment to InTime. (Tr. 4:11–14.) MIA has not repaid these loans.

## C.  Line of Credit Discussions and Collapse of MIA's Manufacturing

In late June, MIA discussed establishing a line of credit with InTime at an in-person meeting between Summers and Petrusnek. What happened at this meeting is disputed. According to Summers, Petrusnek fraudulently promised to float MIA through the IPO and production sales. According to Petrusnek, he made it clear InTime would not provide MIA with a line of credit unless InTime was a senior creditor and had a first mortgage. Based on the credibility of the witnesses[2] and the evidence discussed below, it is clear the parties discussed a line of credit, but never reached an agreement on the line of credit.

---

[2] The Court finds Frank Petrusnek to be a credible witness. He testified in a thoughtful, candid, and consistent manner. His testimony withstood scrutiny on cross examination and there are no material discrepancies between his testimony and the evidentiary record. In comparison, the Court finds Abraham Summers not credible. His demeanor on the stand was combative and evasive. He contradicted himself multiple times on cross examination. (*See* Tr. 190:5–18; 192–193:22–12; 210:1–5, 21–24; 218:8–15.)

On June 27, 2022, Summers sent an email asking MIA's attorney to draft a line of credit agreement between InTime and MIA. Summers specifically stated the new agreement should "amend and supersede the existing agreement that [MIA] has with [InTime]." (Pl.'s Ex. 7.) Summers asked Petrusnek to send the May 26, 2022 staffing agreement to MIA's attorney. Petrusnek never responded. After a flurry of emails between Summers and MIA's attorney, the attorney sent a line of credit agreement to InTime on August 8, 2022. Again, Petrusnek never responded. On August 22, 2022, Summers sent Petrusnek an email stating, "[d]o please let us know where you are with our discussions and the Line of Credit." (Pl.'s Ex. 15.) Once again, Petrusnek never responded. InTime never signed the line of credit agreement. Notably, the line of credit agreement provided by MIA has large "VOID" stamps on each page and is not signed by InTime. (Def.'s Ex. 7.)[3]

In early August, MIA asked InTime for a loan to pay suppliers and utilities. MIA told InTime it was going to file the S-1 in the third or fourth week of August, and that once it submitted the S-1, Target was going to give it a $1.5 million loan. So, on August 25, 2022, without a written agreement, InTime sent MIA the loan for $100,000. Around the same time, MIA's house of cards began to collapse. InTime learned the purchase orders

---

[3] When asked why MIA stamped "VOID" on the agreement, Summers testified he did not believe MIA had stamped the agreement void. When it was pointed out MIA produced the document during discovery, Summers testified he did not know why the agreement was stamped with "VOID." (Tr. 218:8–15.)

showing $8 million in sales were bogus.[4] MIA repeatedly missed target S-1 filing dates and kept pushing the IPO date back. There were no incoming sales. The latex vendor was threatening to cut off MIA's latex supply due to outstanding invoices. In early October, MIA informed InTime it was scaling back manufacturing and furloughing employees to cut expenses. Gas and utility bills were going unpaid. MIA had not paid a single invoice from InTime since mid-June for staffing services.

In late October, MIA asked InTime for another loan to help cover expenses. InTime refused, citing the outstanding balance MIA already owed InTime. (Tr. 59:12–13.) On November 1, 2022, MIA sent InTime a repayment plan. (Pl.'s Ex. 37.) The next day, Summers sent Petrusnek a long email pressuring InTime to loan MIA more money. (Pl.'s Ex. 38.) Again, InTime refused, citing the moving S-1 filing date, overdue invoices, and other financial obligations. (*Id*.) On November 3, 2022, MIA sent InTime a Memorandum of Understanding which proposed InTime (1) provide two more months of staffing services without payment from MIA and (2) pay two utility invoices on behalf of MIA. InTime sent back a marked up copy of the memorandum, requesting a mortgage on the land and plant

---

[4] In total, these purchase orders were for 72 million light blue medical gloves. (Pl.'s Ex. 57.) Summers testified MIA did not manufacture additional gloves for the purchase orders nor did it increase production to meet the demand for 72 million gloves because MIA was "not making those gloves." (Tr. 171:11–16; 226: 3–4.) MIA manufactured orange latex gloves that were not for medical use. (*See* Tr. 54:16–20; Pl.'s Ex. 20.)  Even though MIA did not make light blue medical gloves, Summers testified MIA did not discover the purchase orders were fraudulent until it prepared to ship the gloves and could not verify some of the information. (Tr. 167:2–4.) For example, both purchase orders have a delivery address to the Bronx, New York. (Pl.'s Exs. 56, 57.) The alleged email address for Yale is listed as account@yaleuni-edu.com. (Pl.'s Ex. 57.) The email address for Notre Dame is listed as accountpayable@ndd-edu.us. (Pl.'s Ex. 56.) Even with these oddities, MIA submitted these purchase orders to a factoring company to be vetted. (Tr. 226:10–11.)

in Eufala. (Pl.'s Ex. 42.) Summers rejected the changes, stating the senior lien was held by HarCal and Target, two of MIA's investors. (Pl.'s Ex. 41.) The memorandum was never executed.

In mid-December, MIA confidentially filed its S-1. MIA did not list InTime as an investor on its S-1. According to Summers, InTime was not listed as an investor because MIA "could not submit the signed [line of credit] agreement, so [InTime] was listed as a liability." (Tr. 223:4–8.) MIA did not indicate it was scaling down production on the S-1.

At the end of December, MIA again asked InTime for a loan to pay its $29,513.25 Delaware state franchise tax. If MIA failed to pay its taxes by the end of 2022, it would be unable to go public for another year. InTime thought the key to getting repaid was the $10 million loan that would come after the IPO. So, InTime paid MIA's Delaware state franchise tax. On January 11, 2023, InTime sent MIA a proposed repayment plan, which included payment for both loans. (Pl.'s Ex. 50.) MIA agreed the repayment plan was generally reasonable, but proposed paying only $100,000 per month for the first three months. (*Id.*)

Although InTime provided two loans to MIA, it is clear MIA and InTime never entered into a line of credit agreement. There were discussions about a line of credit, but other than Summers's testimony, there is no evidence InTime promised or entered into a line of credit agreement with MIA. No paperwork was signed by InTime. There were no emails showing InTime accepted MIA's multiple offers.

As of the date of trial, MIA had not gone public, nor was it producing or selling gloves. Besides Summers, MIA had no board members or employees. All of MIA's financial obligations are in default.

## IV.    CONCLUSIONS OF LAW

Based upon the findings of fact set forth above, the Court makes the following conclusions of law.

### A. The Written Contract for Staffing Services

InTime claims MIA breached the written contract for staffing services when MIA failed to pay $1,834,266.55 in overdue invoices. Defendant puts forth the affirmative defense of fraud in the inducement.[5]

### 1. Breach of Contract

Under Alabama law, the elements of a breach of contract claim are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105–106 (Ala. 2002).

Plaintiff has proven by a preponderance of the evidence MIA breached the May 26, 2022 staffing agreement. First, the parties stipulated the May 26, 2022 staffing agreement was a valid and binding contract. Second, InTime performed under the contract when it

---

[5] In its Proposed Findings of Fact and Conclusions of Law, MIA asserts, for the first time, the affirmative defense of mitigation of damages. (Doc. No. 87.) This affirmative defense is not included in MIA's answer. (Doc. No. 7.) Mitigation of damages is an affirmative defense, and failure to plead an affirmative defense results in waiver of that defense. *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000). Because MIA did not plead mitigation of damages, it has waived that affirmative defense.

provided $1,834,266.55 in staffing services to MIA. Third, MIA has not paid the

$1,834,266.55 in overdue invoices as required by the contract. Fourth, MIA's failure to pay

the overdue invoices damaged InTime. Not only is InTime out the $1,834,266.55, but MIA

has not paid the 18% annual interest on its outstanding balance. Thus, Plaintiff proved MIA

breached the May 26, 2022 staffing agreement.

### 2. Affirmative Defense: Fraud in the Inducement

MIA asserts the affirmative defense of fraud in the inducement. Under Alabama law,

fraud in the inducement "consists of one party's misrepresenting a material fact concerning

the **subject matter of the underlying transaction** and the other party's relying on the

misrepresentation to his, her, or its detriment in executing a document or taking a course

of action." *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 976 (Ala. 2016) (emphasis

added). To prevail on a fraudulent inducement defense, MIA must prove: (1) InTime had a

duty to speak the truth; (2) InTime made a false representation of material fact; (3) MIA

reasonably relied upon the false representation; and (4) as a proximate result, MIA suffered

loss, harm, or damage. *Wells Fargo Bank, N.A. v. Trotman*, 940 F. Supp. 2d 1359, 1364–

1365 (M.D. Ala. 2013) (quoting *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1414

(11th Cir. 1997) (citing *Kidder v. AmSouth Bank, N.A.*, 639 So. 2d 1361, 1362 (Ala. 1994))).

Because the alleged fraud included a future promise to loan MIA money, MIA must prove

InTime (1) did not intend to do the acts promised and (2) intended to deceive MIA. *McGriff*,

127 F.3d at 1414 (citing *Sealing Equip. Prod. Co. v. Velarde*, 644 So. 2d 904, 908 (Ala.

1994)).

MIA failed to prove by a preponderance of the evidence the affirmative defense of fraud in the inducement. First, MIA alleges InTime fraudulently promised to provide it with a line of credit *after* the May 26, 2022 staffing agreement was signed. It is nonsensical that a statement made in late June could fraudulently induce MIA into entering a contract it already signed in May. MIA argues it would have canceled the contract had it known InTime was not going to loan it money. Yet, MIA presented no evidence at trial to corroborate this assertion. Furthermore, even if InTime made such a promise, a line of credit does not concern "the subject matter of the underlying transaction." *Morris*, 228 So. 3d at 976. The May 26, 2022 contract concerned staffing services, not a line of credit.

Second, MIA failed to prove InTime "made a false representation of material fact." *McGriff*, 127 F.3d at 1414 (citing *Kidder*, 639 So. 2d at 1362). According to Summers, InTime promised to float MIA through its IPO and production sales. As discussed above, the evidence submitted to the Court does not support Summers's account of the meeting. While the evidence supports the two men discussed a line of credit, the email exchanges that followed the meeting showed InTime did not promise or agree to provide MIA with a line of credit.[6]  Third, MIA did not prove InTime "intended not to do the acts promised and intended to deceive [MIA]." *Id*. MIA introduced no evidence at trial indicating InTime intended to deceive MIA.

---

[6] Even if InTime had promised to provide a line of credit, such a promise would be void under the Alabama Statute of Frauds. Ala. Code § 8-9-2 (1975) (Stating every agreement to loan money must be "in writing and subscribed by the party to be charged therewith."). It is undisputed that InTime never signed a line of credit agreement.

InTime proved by a preponderance of the evidence that MIA breached the May 26, 2022 staffing agreement when it failed to pay $1,834,266.55 in past due invoices. Because MIA failed to prove its affirmative defense of fraud in the inducement, judgment is due to be entered in favor of InTime on its breach of contract claim.

## B. Loans

InTime brings four different claims to recover the $129,513.25 it loaned to MIA: (1) account stated, (2) unjust enrichment, (3) open account, and (4) services sold and delivered. MIA asserts the affirmative defense of statute of frauds. Because InTime proved by a preponderance of the evidence its claim for account stated, the Court does not address the remaining claims.[7]

### 1. Account Stated

An account stated is a post-transaction agreement "between parties to an original account that the statement of the account with the balance struck is correct and that the debtor will pay that amount." *Stacey v. Peed*, 142 So. 3d 529, 532 (Ala. 2013). A "statement of account" can be a bill or invoice. *See Car Center, Inc. v. Home Indem. Co., Inc.*, 519 So. 2d 1319, 1323 (Ala. 1988); *NTA Graphics South, Inc. v. Axiom Impressions, LLC*, 413 F. Supp. 3d 1164, 1182 (N.D. Ala. 2019). To recover, InTime must prove: (1) it balanced the

---

[7] InTime seeks to recover the $129,513.25 it loaned MIA. The claims for unjust enrichment, open account, and services sold and delivered would not alter the amount of damages InTime seeks to recover. *See Scrushy v. Tucker*, 955 So. 2d 988, 1011 (Ala. 2006) (discussing restitution as the remedy for unjust enrichment); *Simple Helix, LLC v. Relus Tech., LLC*, 493 F. Supp. 3d 1087, 1116 (N.D. Ala. 2020) (stating an open account claim arises from a disputed debt); *Int'l Metal Fusion Corp. v. Steward Mach. Co.*, No. 2:18-cv-1180-LCB, 2020 WL 1235498, at *2 (N.D. Ala. Mar. 12, 2020) (stating a plaintiff may recover the price of goods in a claim for goods sold and delivered).

account and presented an invoice to MIA; (2) there was a meeting of the minds as to the correctness of the invoice; and (3) MIA admitted liability. *See Peed*, 142 So. 3d at 532; 1 Ala. Pattern Jury Instr. 12.05, *Account Stated* (4th ed.). "The debtor's admission to the correctness of the statement and to [its] liability thereon can be express or implied." *Peed*, 142 So. 3d at 532. An implied admission occurs when a "bill was rendered and the recipient of the bill failed to object within a reasonable time." *Car Center, Inc.*, 519 So. 2d at 1323.

Here, InTime proved by a preponderance of the evidence its claim for an account stated. First, InTime sent MIA an invoice for each loan. On August 25, 2022, InTime sent MIA an invoice for the $100,000 loan. (Pl.'s Ex. 2 at 14.) On December 29, 2022, InTime sent MIA an invoice for the $29,513.25 loan. (*Id*. at 62.) Thus, InTime proved it presented invoices to MIA for the loans at issue.

Second, MIA impliedly admitted the invoices were correct and it was liable for repayment when it "failed to object within a reasonable time." *Car Center, Inc.*, 519 So. 2d at 1323. No evidence was introduced at trial showing MIA objected to either invoice. In fact, the evidence supports MIA admitted the invoices were correct. For example, MIA stipulated InTime provided it two loans totaling $129,513.25. (Tr. 4:11–14.) Further, Summers testified invoices sent to MIA were accurate. (Tr. 225:2.) Thus, evidence at trial supports there was "a meeting of the minds as to the correctness of the [invoices.]" *Peed*, 142 So. 3d at 532.

Furthermore, the parties introduced evidence at trial showing MIA admitted liability for the two loans. On November 1, 2022, MIA sent InTime its first proposed repayment plan, which included payment for the August 25, 2022 loan. (Pl.'s Ex. 37.) On January 11,

12

2025, InTime sent MIA a proposed repayment plan, which included both loans. (Pl.'s Ex.

50.) MIA agreed the repayment plan was generally reasonable, but proposed paying only

$100,000 per month for the first three months. (*Id.*) Although the repayment plans included

money due on other invoices, MIA's assent to repayment supports the conclusion MIA

admitted liability for the two loans. *See Peed*, 142 So. 3d at 532.

Because MIA failed to object to the two invoices sent for the loans and there was

evidence introduced at trial that suggests an admission to the invoices, InTime proved by

a preponderance of the evidence its claim for account stated.

### 2.  Affirmative Defense: Statute of Frauds

MIA asserts the loans are not recoverable due to Alabama's Statute of Frauds. (Doc.

No. 87 at 12.) The Alabama Statute of Frauds states in relevant part:

> In the following cases, every agreement is void unless such agreement or
> some note or memorandum thereof expressing the consideration is in writing
> and subscribed by the party to be charged therewith or some other person by
> him thereunto lawfully authorized in writing: . . .
>
> (7) Every agreement or commitment to lend money, delay or forebear
> repayment thereof or to modify the provisions of such an agreement or
> commitment except consumer loans with principal amount financed less than
> $25,000

Ala. Code § 8-9-2 (1975).

The Statute of Frauds "requiring certain contracts to be in writing applies to

executory and not executed contracts." *Scott v. S. Coach & Body Co.*, 197 So. 2d 775, 777

(Ala. 1967). "The plain language of the Statute requires an agreement to commitments to

lend money, not to repay money that has been borrowed." *Carter v. Holland*, 825 So. 2d

832, 836 (Ala. Civ. App. 2001). Once "money has been lent, the agreement becomes an

executed contract as to the lender . . . and the Statute of Frauds is no longer applicable." *Id*. Thus, the Alabama Statute of Frauds does not bar a claim, such as account stated, to recover money that has already been lent. *See Rozell v. Childers*, 888 So. 2d 1244, 1247 (Ala. Civ. App. 2004) (holding the Statute of Frauds did not bar a claim for account stated because an oral agreement to repay money already lent falls outside the Statute of Frauds). Because InTime lent the $129,513.25 to MIA, the Statute of Frauds is no longer applicable as an affirmative defense.

InTime proved by a preponderance of the evidence (1) it presented invoices for the loans to MIA; (2) there was a meeting of the minds as to the correctness of the invoices; and (3) MIA impliedly admitted liability. Because MIA cannot bring the Statute of Frauds as an affirmative defense, judgment is due to be entered in favor of InTime on its account stated claim.

## V.   CONCLUSION

For the foregoing reasons, judgment is due to be entered in favor of Plaintiff InTime, and against Defendant MIA, on the breach of contract claim in the amount of $1,834,266.55, plus pre-judgment and post-judgment interest.

Judgment is also due to be entered in favor of Plaintiff InTime, and against Defendant MIA, on the account stated claim in the amount of $129,513.25, plus post-judgment interest.[8]

---

[8] As InTime correctly notes, it is not entitled to attorney fees. *See Jones v. Regions Bank*, 25 So. 3d 427, 441 (Ala. 2009) ("It is well settled that Alabama follows the 'American rule,' whereby attorney fees may be recovered if they are provided for by statute or by contract.").

A separate judgment will issue.

DONE this 21st day of August, 2025.

 

 

_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE